IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

OCC-O'CONNOR CROPS & CATTLE V. PARKER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

OCC-O'CONNOR CROPS AND CATTLE, LLC, APPELLEE,

V.

R. BRUCE PARKER ET AL., APPELLANTS.

Filed December 8, 2020.    No. A-19-1166.

Appeal from the District Court for Deuel County: DEREK C. WEIMER, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.

Glenn A. Pelster, of Pelster Law Office, for appellants.

Timothy P. Brouillette and Margaret R. Jackson for appellee.

PIRTLE, Chief Judge, and MOORE and RIEDMANN, Judges.

RIEDMANN, Judge.

INTRODUCTION

R. Bruce Parker (Bruce), Audra Parker (Audra), and Black Hills Organics, LLC (BHO), (collectively the appellants), appeal the order of the district court for Deuel County, which entered summary judgment in favor of OCC-O'Connor Crops and Cattle, LLC (OCC) in this breach of contract action. We affirm the entry of summary judgment as to the breach of contract but reverse the damage award and remand for further proceedings as explained below.

BACKGROUND

Ty O'Connor is the owner of OCC, a Montana cattle services business. Bruce and Audra are the owners of BHO. OCC sends its organic cattle to BHO, and BHO feeds the cattle and sells it for slaughter. In November 2016, OCC and BHO entered into a written contract regarding their cattle arrangement. The contract provided for a base price of $1,000 per animal, payable to OCC

at the time of slaughter. BHO was to receive feed costs of $1.38 per pound of weight gain above the animals' starting weight, payable to BHO at the time of slaughter. The profit remaining was to be split between the parties after death loss was deducted. The contract also provided that OCC had the right to retain replacement heifers if desired and pay feed costs to BHO of $2.25 per day.

Based on this contract, OCC delivered to BHO 1,217 head of organic cattle in November 2016. In November 2017, the parties entered into a second contract relating to the same cattle. By this time, 10 of the original cattle had died, leaving 1,207 remaining. The second contract also provided for a base price to OCC of $1,000 per head, but payment was to be made at that time rather than at the time of slaughter. Death loss from the original count of 1,217 was to be paid out with profit share. Profit share was to be paid to OCC after the base price was covered and feed costs of $1.38 per pound of weight gain above the 582-pound delivery weight to kill weight at the time of slaughter was covered. Payment was to be made on April 1, 2018, on all prior months for profit share, and payment on the remainder was to be made within 15 days after the last kill. It contained no provision related to feed costs for retained cattle.

Approximately 900 of the total 1,217 cattle were sold for slaughter. An additional 18 died. The remainder of the cattle were not able to be sold at the organic rate for slaughter and were sold, some in a video auction and some to Audra, at regular market rate. OCC did not retain any cattle.

In September 2018, OCC filed a complaint, alleging that the appellants had breached the contract by failing to pay all of the profit share to which OCC was entitled. OCC sought $180,000 in damages. In each of their answers, the appellants admitted the existence of the contracts, and the specific language contained therein. BHO asserted a counterclaim claiming breach of contract and quantum meruit. It alleged that OCC owed it feed costs of $2.25 per day for the approximately 300 head of cattle that were not sold for slaughter "and therefore retained." BHO sought $251,775 in damages on its counterclaim.

OCC moved for summary judgment as to its claim and BHO's counterclaim. At the hearing, the evidence established the events described above. The evidence additionally established that O'Connor had received the base price of $1,000 per head for the 1,207 cattle that remained at the time the second contract was signed. The parties also agreed that despite the information contained in the contract and their pleadings, the correct starting weight for the cattle was 567 pounds, rather than 582 pounds, because the parties neglected to subtract a 3-percent reduction, referred to as a 3-percent "shrink," to account for what remains in a heifer that is not beef.

Audra testified at her deposition that she handles the bookkeeping and accounting for BHO and admitted that OCC had not been paid all of the profit share to which it was entitled. However, she also believed that OCC owed BHO the feed costs of $2.25 per day for the approximately 300 cattle that were not sold as organic for slaughter. According to her calculations, those feed costs totaled more than $250,000.

After the summary judgment hearing, the district court entered a written order finding that the contracts, read together, were neither unclear nor ambiguous, but, rather, they were plainly stated and straightforward. The court determined that the provision regarding the feed costs associated with retained heifers was applicable only to "retained heifers," and because the parties agree that OCC did not retain any heifers, the $2.25 feed rate did not apply. The court additionally

concluded that OCC had met its burden of proving a prima facie case that it was entitled to judgment on its breach of contract claim if the evidence was uncontroverted at trial and that the appellants did not meet their burden of demonstrating the existence of a genuine issue of material fact. The court therefore granted OCC's motion for summary judgment as to its breach of contract claim and as to the counterclaim regarding the feed rate for retained heifers. The court awarded OCC damages of $180,000. The appellants filed a motion to alter or amend, which was denied. This timely appeal followed.

ASSIGNMENTS OF ERROR

The appellants assign that the district court erred in (1) granting the motion for summary judgment, (2) dismissing the counterclaim, and (3) entering judgment in favor of OCC in the amount of $180,000.

STANDARD OF REVIEW

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Russell v. Franklin County*, 306 Neb. 546, 946 N.W.2d 648 (2020).

An appellate court reviews the district court's grant of summary judgment de novo, viewing the record in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Id*.

ANALYSIS

The appellants first argue that the district court erred in granting OCC's motion for summary judgment because the contract was ambiguous and OCC failed to establish a prima facie case. We disagree.

A party moving for summary judgment must make a prima facie case by producing evidence to demonstrate that the movant is entitled to judgment if the evidence were uncontroverted at trial. *Cattle Nat. Bank & Trust Co. v. Watson*, 293 Neb. 943, 880 N.W.2d 906 (2016). Once the moving party makes a prima facie case, the burden to produce evidence showing the existence of a material issue of fact that prevents judgment as a matter of law shifts to the party opposing the motion. *Id*.

We first note that OCC moved for, and was granted, summary judgment in its favor as to its claim for breach of contract and as to BHO's counterclaim. In its counterclaim, BHO claimed that it was entitled to the $2.25 daily feed rate for the approximately 300 cattle that were not slaughtered. The district court determined that the $2.25 feed rate applied only to cattle which were retained by OCC, and the parties agree that OCC did not retain any of the 1,217 cattle at issue. Thus, the court held that the $1.38 feed rate applied to all 1,217 head of cattle. We agree.

The specific language of the first agreement stated in relevant part:

– $1000 base price per animal, payable at time of slaughter to OCC[.]

– $1.38 feed cost per lb. of gain payable to BHO at time of slaughter.

. . . .

– OCC will have the right to retain replacement heifers if desired and pay feed costs to BHO at the rate of $2.25 per day[.]

The second agreement contained no language regarding feed payment for retained heifers. Instead, it reads in relevant part:

- $1000.00 will be paid as the base price on 1207 head of Certified Organic GAP, 4 steers and heifers.

. . . .

- Profit share will be paid, after base price is covered and feed costs on gain of $1.38 a lb from the 582 delivery weight to kill weight at time of slaughter[.]

The appellants argue that "the issue before the court is determining which provision applies to cattle which were neither slaughtered, nor retained as replacement heifers, but rather sold on a video auction." Brief for appellants at 12. They contend this presents a factual issue unsuitable for summary judgment. We disagree.

Contrary to BHO's argument, the first agreement does not limit the $1.38 feed cost to animals that are slaughtered. Rather, the provision identifies *how* the feed cost will be determined and *when* it must be paid; that is, feed cost is calculated based upon how much weight has been gained and that amount is to be paid at time of slaughter. This interpretation is supported by a comparison of the differing provisions related to base price contained in the two agreements. The first agreement states that base price is to be paid at time of slaughter; the second agreement states simply that the $1,000 per animal base rate is to be paid. The parties explained in their depositions that the $1,000 per animal was paid at the time the second agreement was executed. Therefore, we read the provision in the first agreement to establish when the feed rate must be paid, and the method for determining the amount.

The second agreement does not contain the $2.25 feed rate. Although the parties take differing views of whether the second agreement amended the first agreement or whether it supplemented it, their differing interpretations do not create a genuine issue of material fact or an ambiguity. The fact that parties to a document have or suggest opposing interpretations of the document does not necessarily, or by itself, compel the conclusion that the document is ambiguous. *Strunk v. Chromy-Strunk*, 270 Neb. 917, 708 N.W.2d 821 (2006). It is only when uncertainty remains concerning which of two or more reasonable meanings represents the intention of the parties after application of the pertinent rules for construction that a contract is ambiguous. See *id*.

Here, the second agreement was executed on November 21, 2017, the date on which the parties agree BHO paid the base price for all remaining live cattle. BHO asserted in its counterclaim that on that date, the heifers were sold to BHO. There was no need for a provision in the second contract addressing the feed price for cattle OCC had a right to retain. Therefore, contrary to appellants' claim that a factual determination must be made as to which feed cost is applicable to cattle which were neither retained nor slaughtered, the only applicable feed price agreed upon between the parties at the time of the second contract was $1.38 per pound of weight gained.

Appellants claim that the court engaged in a factual finding when it interpreted the word "slaughter" as synonymous with the word "sale." We disagree. The district court determined as a matter of law that the $1.38 feed price applied to all cattle because none were retained. A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable, but conflicting interpretations or meanings. *Ruble v. Reich*, 259 Neb. 658, 611 N.W.2d 844 (2000). Here, based upon the language of the two contracts and the undisputed facts that at the time the second contract was executed, the base price for all live cattle was paid and BHO retained no cattle, the only reasonable interpretation of the contract is that the $1.38 feed price applied to all cattle and it was to be calculated at the time OCC disposed of them, either by slaughter or sale.

As explained above, the appellants also challenge the district court's entry of summary judgment in OCC's favor on its breach of contract claim, arguing that OCC failed to establish a prima facie case. In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty. *Phipps v. Skyview Farms*, 259 Neb. 492, 610 N.W.2d 723 (2000).

The appellants admitted that they entered into two contracts with OCC, and copies of the contracts were received into evidence at the summary judgment hearing. The operative contract was signed on November 21, 2017, by Bruce on behalf of BHO and by O'Connor on behalf of OCC. According to the contract, BHO was to pay OCC $1,000 per head for 1,207 cattle, and O'Connor acknowledged that he had received that amount. The $1,000 per head for each of the 10 cattle that initially died was to be paid out with the profit share. Payment was to be made on April 1, 2018, on all prior months for profit share, and the remaining payment was to be made within 15 days after the last kill. The last kill date was July 24, 2018.

In Audra's deposition, which was conducted in March 2019, she admitted that there were additional profit share sums that were still owed to OCC which had not been paid. According to her calculations, the amount exceeded $50,000. It was the appellants' position that OCC was not entitled to additional profit share because OCC owed them the $2.25 per day feed rate on the 300 cattle that were sold. Given the outcome of the counterclaim, however, BHO is not entitled to this additional compensation, and thus, OCC established that BHO breached the contract by failing to pay OCC the profit share to which it was entitled within 15 days after the last kill. As such, the district court did not err in finding that a breach of contract had occurred.

Upon making this finding, the court awarded OCC damages of $180,000. The appellants also challenge the damage award, claiming that the evidence was insufficient to support the amount. We agree and therefore reverse the damage award and remand for further proceedings.

Neither OCC's complaint nor the district court's order explains how it arrived at total damages of $180,000. O'Connor explained that the parties agreed to split profits equally, so each party was to receive 50 percent. According to the contract and O'Connor's testimony, the profit share was to be calculated by beginning with the sale price paid for the cattle. From that figure, the base price of $1,000 per head, including for deceased animals, was to be paid to OCC and the feed costs of $1.38 per pound of weight gain over 582 pounds per head were to be paid to BHO. We note that the record contains evidence that rather than 582 pounds, the correct starting weight

should have been 567 pounds; however, BHO does not assign or argue that the court erred in determining the correct starting weight; therefore, we affirm the use of this number in the calculation of damages. The figure remaining after deducting the base price and feed costs is to be split equally between the parties as profit.

Despite the clarity of the evidence on the proper measure of damages, the amount of damages to which OCC is owed is less clear. O'Connor testified that the average weight of the 1,217 cattle at the time of sale was 775 pounds. A spreadsheet prepared by Audra received into evidence, however, lists much higher and varying sale weights for 28 different groups of cattle. The spreadsheet additionally improperly utilizes 551 pounds as the starting weight for all of the cattle, rather than 582 pounds. Even if we adjust the starting weight for the cattle and complete the calculations, we are unable to discern how OCC and the district court arrived at the $180,000 figure.

It is apparent from O'Connor's deposition that a spreadsheet existed showing his calculations of profit split, but it was not attached to his deposition that was offered at the summary judgment hearing, nor is it contained elsewhere in our record. OCC's exhibit list identifies "Plaintiff's calculations on cattle" as an exhibit, but it was not offered at the summary judgment hearing, either. Given the conflicting and unclear evidence as to the proper damage amount, we conclude that the district court erred in granting summary judgment on the issue of damages. See *Griffith v. Drew's LLC*, 290 Neb. 508, 860 N.W.2d 749 (2015) (proper measure of damages presents question of law, but amount of damages presents question of fact). We therefore reverse the award of $180,000 and remand the cause for further proceedings to determine the appropriate amount of profit share to which OCC is entitled using a starting weight of 582 pounds and a feed cost of $1.38 per pound of weight gain for all 1,217 head of cattle.

## CONCLUSION

We affirm the district court's order granting summary judgment on OCC's breach of contract claim and the counterclaim. However, we reverse the entry of summary judgment as to the amount of damages and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.